**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

DIANA JO MEYERHOFF,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,

        Commissioner of Social
        Security.

No. C 09-3067-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION**

———————————

**TABLE OF CONTENTS**

*I.* *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        *1.* *Introductory facts and Meyerhoff's hearing testimony* . . . . . . 5
        *2.* *Meyerhoff's medical history* . . . . . . . . . . . . . . . . . . . . . 7
        *3.* *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . 28
        *4.* *The ALJ's Decision* . . . . . . . . . . . . . . . . . . . . . . . . . 29

*II.* *LEGAL STANDARDS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    *A.* *Review Of A Report And Recommendation* . . . . . . . . . . . . . . . 32
    *B.* *Review Of The Commissioner's Decision* . . . . . . . . . . . . . . . 38

*III.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*IV.* *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## I.  INTRODUCTION

### A.  Procedural Background

On October 8, 2004, Plaintiff Diana Jo Meyerhoff filed an application for Title II[1] disability insurance, alleging a disability onset date of July 1, 1997.  The application was denied and Meyerhoff did not appeal.  Meyerhoff filed another application for SSI benefits on August 19, 2005, again alleging July 1, 1997 as the onset date.  The August 19, 2005, application was also denied and Meyerhoff did not appeal.

On  August 17, 2006, Meyerhoff filed a third application for SSI benefits, again alleging a disability onset date of July 1, 1997.  In her third application, Meyeroff claims that she is disabled due to arthritis, fibromyalgia, osteoporosis, and "leaking arteries." She claims that these alleged conditions cause her trouble with lifting, standing, and memory.  After Meyerhoff's application was initially denied, and while it was on reconsideration, she requested a hearing.  A  hearing was held on January 27, 2009, before an Administrative Law Judge ("ALJ").  At this hearing, Meyerhoff appeared without a representative.  Meyerhoff was given a continuance to obtain representation.  The hearing reconvened on April 9, 2009, at which time Meyerhoff was represented by attorney Ruth Carter.  Meyerhoff and a Vocational Expert ("VE"), Robert Marquart, both testified at the hearing.  On May 8, 2009, the ALJ denied Meyerhoff's application for benefits, finding that although Meyerhoff has some severe impairments, she is able to work.  Meyerhoff

---

[1]Title II of the Social Security Act provides insurance benefits to individuals who establish that they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423.

appealed the ALJ's ruling, and on August 28, 2009, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner.

On October 22, 2009, Meyerhoff filed a timely Complaint (docket no. 3) in this court seeking review of the ALJ's ruling. The case was referred to Chief United States Magistrate Judge Paul A. Zoss for a report and recommendation, in accordance with Administrative Order #1447.

On February 19, 2010, Meyerhoff filed her brief (docket no. 10). In her brief, Meyerhoff claimed: 1) That there is not substantial evidence in the record to support the ALJ's determination of Plaintiff's residual functional capacity; 2) That the ALJ failed to pose a hypothetical question to the VE that clearly presents a set of limitations that mirror Meyerhoff's; and 3) that the overwhelming evidence of record, when given the weight the rules demand, support a finding that she is disabled and that a remand for payment of benefits is appropriate.

On March 29, 2010, the Commissioner filed his brief (docket no. 11). According to the Commissioner, the ALJ properly evaluated the credibility of Meyerhoff's subjective allegations; the ALJ properly considered the medical opinions of record; and substantial evidence supports the ALJ's determination that Meyerhoff retained the residual functional capacity to perform other work in the national economy.

On July 26, 2010, Judge Zoss issued his Report And Recommendation (docket no. 15). Judge Zoss found that the record contains substantial evidence that Meyerhoff would be unable to sustain full-time employment on a sustained basis. Judge Zoss found that the ALJ failed to credit Dr. Dankle's opinion that Meyerhoff "likely will need to change positions on a regular basis," and would only be able to "stand, move about, walk, and sit at her tolerance." Judge Zoss also found that the ALJ failed to include the appropriate limitation, on Meyerhoff's ability to sit, from the residual functional capacity, in the

hypothetical question to the VE. Not only did Judge Zoss find that substantial evidence supported a finding that Meyerhoff would be unable to sustain full-time employment on a sustained basis, but that the record "overwhelmingly supports" an immediate finding of disability, allowing reversal and an immediate finding of disability, in accordance with *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000). Judge Zoss concluded that the remaining issue to be determined is the applicable time period of Meyerhoff's disability, noting that the ALJ did not make *any* determination as to whether or not Meyerhoff's prior applications should be reopened and, instead, only considered whether Meyerhoff had been disabled since August 17, 2006, the date that Meyerhoff had filed her most recent application. Therefore, Judge Zoss recommended that the Commissioner's decision be reversed and that the case be remanded for a determination of when Meyerhoff's disability began, and whether to reopen her prior applications, for purposes of calculation and immediate award of benefits.

On August 9, 2010, the Commissioner filed Objections To The Report And Recommendation (docket no. 16). The Commissioner objects to Judge Zoss's conclusion that the case needs to be remanded for further proceedings related to the reopening of prior applications. The Commissioner argues that generally, a claimant loses the right to further review of a determination if the claimant does not request further review within the stated time period. *See* 20 C.F.R. § 416.1487. The Commissioner argues that, while a determination may be reopened "within 12 months of the date of the notice of the initial determination, for any reason," pursuant to 20 C.F.R. § 416.1488(a), the ALJ did not reopen the prior final determinations in this case. On this basis, the Commissioner argues, that the ALJ's decision not to reopen prior applications is not subject to judicial review, citing to *Efinchuk v. Astrue*, 480 F.3d 846, 848 (8th Cir. 2007). The Commissioner, however, argues that remand for further consideration of whether Meyerhoff is disabled,

rather than reversal and award of benefits, is the appropriate remedy in this case. The Commissioner argues that there is not "overwhelming evidence" supporting an "immediate finding of disability," as required by *Buckner v. Apfel*, 213 F.3d. 1006, 1011 (8th Cir. 2000).

## B.  Factual Background

No party has objected to any of Judge Zoss's findings of fact. Thus, this summary of the factual background to Meyerhoff's disability claims is drawn from Judge Zoss's more exhaustive statement. However, this summary focuses somewhat more specifically on the factual issues that the court finds are relevant to the determination of whether or not overwhelming evidence supports Meyerhoff's claim of disability, although enough other facts are presented to provide necessary factual context.

### 1.     Introductory facts and Meyerhoff's hearing testimony

Meyerhoff was 54 years old at the time of the hearing on April 9, 2009. She last worked full time prior to 2004, as a housekeeper at a Holiday Inn Express. Prior to her employment at the Holiday Inn Express, Meyerhoff worked for ServiceMaster in another cleaning job. Both of the cleaning jobs required her to be on her feet all of the time, do vacuuming and dusting, picking up garbage, cleaning restrooms, and lifting from twenty to fifty pounds. (R. 42) She stated that she stopped working altogether due to "burning pains up in [her] upper thighs." (R. 41)

Meyerhoff stated that she was diagnosed with fibromyalgia in 1997, when she was working for ServiceMaster. She began having problems with her elbow that caused her to seek medical attention. That led to a referral to a specialist, who x-rayed her back and diagnosed fibromyalgia. She also has been diagnosed with spinal stenosis. (R. 42-43)

Meyerhoff stated she has pain in her lower back, on the left side of her neck, and along her shoulders. She has been tested for fibromyalgia "trigger points," which apparently were positive, but, to her knowledge, there is no treatment for the condition. She did physical therapy and learned some exercises, which she does every day. She takes Tylenol regularly for pain, but she has declined to take any stronger pain medication. She also uses heat at times, which helps her pain somewhat. Meyerhoff testified that she can sit about ten to fifteen minutes without shifting positions and that she sometimes has to lie down. (R. 44-45) She also stated that after sitting for about fifteen minutes, she will get up and move around for awhile until her legs start hurting, when she sits down again. (R. 45)

Meyerhoff also has headaches that require her to sit and rest, or lie down, about three times a week. Meyerhoff believes that these are a symptom of fibromyalgia. (R. 46) Meyerhoff indicated her neck pain is getting worse, and she believes her spinal stenosis is the cause of her neck pain. (R. 47)

She also has carpal tunnel syndrome on the left side that causes her hand to tingle and affects her ability to hold things. She has difficulty opening bottles and jars because of hand weakness. She also has sharp pains in her knees, making it hard for her to walk, and pain in her legs that she treats with Tylenol and heat. (R. 48-49)

At the time of the hearing, Meyerhoff was living with her son, who was thirty years old. He and her younger son, age seventeen at the time of the hearing, were doing the house and yard work. Meyerhoff does the cooking, but she has to sit down to cook. (R. 50-51) Her youngest son goes grocery shopping with her because she does not "have the strength to push a cart." (R. 51)

On a typical day, Meyerhoff has breakfast, and then talks with her daughter or her sister on the phone. She tries to take short walks every day because doctors have indicated

walking is good for her fibromyalgia, but she can only walk about a block without stopping due to pain in her legs or her lower back. (R. 51-52) She is not involved in a church or social clubs, and does not leave her home for social functions. She used to help out at her daughter's school, or be an assistant on the school bus, but she stopped these activities in about 2005, because she developed anxiety attacks when she was around a lot of people. (R. 52) She stated that she has about two to five anxiety attacks in a month. Each attack lasts about 25 minutes. The attacks can happen any place, at any time, are not caused by any particular thing, and leave her exhausted. (R. 53-54)

Meyerhoff did not graduate from high school. She had difficulty learning math and does not work well with numbers, but she reads and writes relatively well. She has memory problems, such as forgetting what month or day it is. (R. 55)

### 2. *Meyerhoff's medical history*

Meyerhoff saw Dennis E. Colby, D.O., several times in 1997, with complaints of pain in both arms and elbows, cervical spine muscle spasms, shoulder tenderness, right thigh pain, heel and Achilles tendon pain, left hip and low back pain, and other general medical complaints. (R. 670-76) On April 29, 1997, the doctor noted Meyerhoff indicated she had been having "problems off and on for about 2 years now." (R. 676) He opined she had "more of a strict ligament problem" in her shoulder, but he also noted spasms "in the lower lumbar area as well as the ileosacral junction." (*Id.*) He prescribed hot packs and over-the-counter medications, as well as Daypro, a nonsteroidal anti-inflammatory medication. (*Id.*)

Meyerhoff saw Dr. Colby on January 19, 1998, with complaints of "pains pretty much all over." She reported "pains in her arms, lower back, right shoulder, center of chest, knees, left ear and head." (*Id.*) Dr. Colby diagnosed "Probable Fibromyalgia," and ordered a rheumatoid battery of tests. He also started her on Aleve pending receipt

of the test results. (R. 670) Meyerhoff saw Dr. Colby on January 23, 1998, for followup. She reported that Vicoprofen was helping her pain somewhat. Examination revealed muscle spasms in the trapezius and cervical muscles on both sides. She was referred to R. Bruce Trimble, M.D., for consultation. (R. 669)

Meyerhoff returned to see Dr. Colby for followup on February 6, 1998. She exhibited "quite a bit of tenderness . . . in the cervical and trapezius muscles and joints of the shoulders, down into the muscles of the shoulders. This pain extends down into the thoracic area." (*Id.*) The doctor planned to try to move up the consultation with Dr. Trimble. (*Id.*)

On February 25, 1998, Meyerhoff was evaluated by Rehabilitation Services at Mercy Health Center to receive physical therapy for her back pain, bilateral shoulder pain, and fibromyalgia. On objective testing, she exhibited "increased pain with all movements." (R. 760)

Meyerhoff saw Dr. Colby on March 2, 1998. Dr. Colby noted that "Dr. Trimble wanted us to take a look at her and see how she is doing. She is quite sore especially with the physical therapy. Dr. Trimble did agree with our previous diagnosis of fibromyalgia on her. According to the physical therapist they would like to try some traction on her." (R. 668) Meyerhoff returned to see Dr. Colby on March 6, 1998, "for a consult on her disability." (*Id.*) She reported having a lot of pain in her upper back and neck, and her arms. Objective examination revealed spasms in the trapezius muscle and in her back. She requested information on SSI. (*Id.*) On March 30, 1998, Dr. Colby prescribed a TENS unit and continued physical therapy. (*Id.*)

On May 13, 1998, Meyerhoff saw Dr. Colby for pain and stiffness in her wrist area. She was diagnosed with wrist inflammation, bicipital tendonitis, and epicondylitis. The doctor prescribed Naprosyn. (R. 667)

On August 5, 1998, Meyerhoff saw Dr. Colby for complaints of pain in her back and depression, reporting severe mood swings and some suicidal thoughts. Examination showed "some spasm . . . in the cervical and trapezius muscle on both sides and down the thoracic area." (R. 666) She was diagnosed with muscle spasms and depression, and was directed to use hotpacks. The doctor prescribed Naprosyn and Paxil. (R. 665)

On November 13, 1998, Meyerhoff underwent a Functional Capacity Evaluation by Steve Crane, P.T., at Dr. Colby's request. (R. 753-55) Crane noted the following Positive Findings:

1. Pain affecting both shoulders, bilateral elbows, and left wrist. The patient was overtly sensitive to touch in the left low back and gluteal regions, along with bilateral medial scapular, upper trapezius, and levator musculature.
2. The patient complained of wrist flexor pain with passive wrist flexion. These two are not typically related.
3. Difficulty maintaining one posture for greater than 15 minutes. She is limited in walking to 2 blocks, sitting up to 10 minutes and standing for 5 minutes, according to the patient.
4. Limited cervical side bending bilaterally, but left greater than right. She is limited with left shoulder internal rotation, guarded with trunk range of motion, especially with side bending.
5. The patient has 3/5 strength in the lumbar paraspinal area with prone active extension.
6. Bilateral grip weakness. Bell-shaped curves are displayed with testing, but a relative high coefficient of variance scores are noted.
7. Coordination skills are below normative levels for age and gender, and the patient needed a significant amount of verbal encouragement to increase her pace with testing.
8. The patient demonstrated difficulty with left leg balance skills.
9. The patient's lifting abilities were moderate, although she fatigued quickly at the end of testing, especially with pushing and pulling activities.
10. Two of five Waddel's signs were positive, which was not significant to indicate inappropriate illness behavior. (R. 753)

Dr. Crane's assessment indicated that Meyerhoff "functioned best with self-pace[d] activities and activities that required a regular change of position." (*Id.*) Dr. Colby reviewed and concurred in the evaluator's recommendations. (*Id.*)

Meyerhoff received an "outpatient psychological evaluation to rule out depression", on March 1, 1999, from L. Frohnauer, Ph.D. (R. 734-35) Dr. Frohnauer stated that Meyerhoff was "depressed secondary to health, financial and work-related stressors and could benefit greatly from antidepressant medication. Participation in the fibromyalgia support group sponsored by the Women's Health Counseling Center is also recommended." (R. 735)

On June 21, 2000, Meyerhoff saw Dr. Colby for complaints of right upper arm pain, extending down into her arm and fingers. Dr. Colby determined, after examination, that there was "[m]arked tenderness and spasm . . . in the trapezius muscle with the right being worse than the left. Range of motion of right shoulder is markedly decreased. Strength is markedly decreased compared to the left. Cannot abduct the arm and strength is predominantly diminished. Tenderness noted in the thoracic and lumbar paravertebral muscles. Deep tendon reflexes 1+/4+. Muscles in the lower extremities are tender to palpation." (R. 661) Dr. Colby diagnosed fibromyalgia "with definite progression from last visit here," and right shoulder instability. He directed Meyerhoff to continue using over-the-counter anti-inflammatories.

On June 18, 2002, Meyerhoff saw Dr. Colby to request "an appointment in Iowa City with Internal Medicine for an appointment for the fibromyalgia. Has been trying to get on disability. Has been denied." (R. 660) Although Dr. Colby made Meyerhoff an appointment in Iowa City, no medical records from that referral appear in the Record.

On Februray 13, 2004, Meyerhoff was seen for right mid back pain, stating that "[s]he wanted to discuss the fibromyalgia but she doesn't want any medication for it. She

doesn't want treatment for it. It sounds like her concern is she would like to be on disability for it." (*Id.*) She was referred to the Mayo Clinic "to see if they can offer her other possibilities for non-pharmacological treatment and application for disability." (*Id.*)

In March 2004, Meyerhoff was evaluated in a fibromyalgia program at the Mayo Clinic. (R. 426-39) She reported symptoms including diffuse musculoskeletal pain, exercise intolerance, very poor sleep, depression, daily pain and fatigue, headaches, burning pain in her legs, decreased appetite, numbness, stiffness, multiple sensitivities, short-term memory impairment, decreased ability to concentrate and organize thoughts, irritability, and anhedonia. She stated her physical symptoms were aggravated by prolonged sitting or standing. She indicated her symptoms limited her ability to carry out activities of daily living including homemaking, social, and leisure activities. (*Id.*) She was diagnosed with generalized chronic pain, fibromyalgia, depression, non-restorative sleep, and right chest wall pain. (R. 426, 429) She completed a two-day fibromyalgia treatment program "involving Rheumatology, rehab, physical medicine, and psych" (R. 434), and she received education and materials on the "definition, causes, and treatment of fibromyalgia; stress management, relaxation, sleep hygiene, moderation, selfmanagement concepts, cycle of chronic pain, and difficult day planning." (R. 427) She also received some occupational therapy to learn "skills to maximize function in activities of daily living and reduce fatigue." (R. 438) She was instructed in range-of-motion stretching exercises, body mechanics, and aerobic conditioning. (R. 439)

Meyerhoff was seen for right thigh pain on April 27, 2004 (R. 415); left anterior shoulder and chest pain on August 16, 2004 (R. 414); a groin muscle strain on August 27, 2004 (R. 738-41); and right hip and upper leg pain on October 11, 2004 (R. 403). She was treated with Ibuprofen, Tylenol, and Trazodone.

On November 16, 2004, Meyerhoff saw Dr. Trimble for consultation with regard to her complaints of back and leg pain. Having seen Meyerhoff previously on February 11, 1998, he noted that he "thought she basically had fibromyalgia with some degenerative disk disease at that point." (R. 399) Meyerhoff stated her pain had remained basically the same, with recent worsening across her back into the right hip area. She was performing normal daily activities. She reportedly would not sleep well, and experienced stiffness for about four hours after awakening in the morning. She occasionally experienced "vague anterior chest discomfort after heavy work which may last the whole day." (*Id.*) She was taking only Tylenol for her pain. (*Id.*) On examination, Meyerhoff exhibited full range of motion of all joints. She exhibited tenderness "of lateral epicondyles of the elbows, over a couple proximal interphalangeal joints, around the knees as well as the medial fat pads." (R. 400) Dr. Trimble ordered x-rays of Meyerhoff's lumbosacral spine which indicated "[m]ild degenerative changes of the lower lumbar spine," and "[m]ild arthritis of the SI joints and hip joints." (R. 398, 401, 454-55) He started her on Nortriptyline at night, and Naproxen twice daily for pain. (R. 400)

Dr. Trimble saw Meyerhoff again on December 16, 2004. Meyerhoff reported sleeping somewhat better on Nortriptyline, and the doctor increased her dosage. He emphasized "the great importance of mild regular exercise, in addition to the need to pace activities and get adequate rest." (R. 949) He directed her to continue taking Naproxen and Tylenol for pain as needed. (*Id.*)

On December 29, 2004, Stephen Holbrook, Psy.D., conducted a clinical interview and performed a mental status evaluation of Meyerhoff at the request of the state agency. (R. 386-95) Dr. Holbrook noted Meyerhoff "has a limited and sporadic work history." From his mental status evaluation, Dr. Holbrook diagnosed Meyerhoff with Major

Depressive Disorder, Recurrent, Mild Severity; ruled out psychological factors that affect underlying medical condition; and he estimated her current GAF at 58. (R. 390)

On January 10, 2005, Meyerhoff saw a doctor with complaints of abdominal pain and nausea for three weeks. Notes indicate Meyerhoff had been started on Naprosyn and Nortriptyline in November 2004, for her fibromyalgia, and Meyerhoff had experienced "some mild improvement in her symptoms." (R. 517) The doctor suspected the Naprosyn and Nortriptyline might be the cause of Meyerhoff's current symptoms. She discontinued the medications for one week, and prescribed five days of Aciphex and three days of Milk of Magnesia. If Meyerhoff's symptoms improved, then other medications would be tried for the fibromyalgia. (R. 518)

On January 11, 2005, Carole Davis Kazmierski, Ph.D., reviewed the record and completed a Psychiatric Review Technique form. (R. 365-79) She found Meyerhoff to have mild depression that was not severe.

On April 18, 2005, Meyerhoff was seen for complaints of chest pain and pressure, and a backache. She reported feeling shaky, nauseated, and "down." (R. 507) A chest x-ray was negative (R. 512), and she was scheduled for a stress test. On April 19, 2005, she underwent a stress cardiolite test during which she "exercised for 8 minutes 12 seconds on Bruce protocol. The study was terminated secondary to leg pain." (R. 499) Meyerhoff experienced no chest pain or shortness of breath during the study, and there were "[n]o electrocardiographic changes to suggest any ischemia." (*Id.*) Further testing in April and May 2005, showed no abnormalities in Meyerhoff's heart or lungs. (*See* R. 714-32)

On June 9, 2005, Meyerhoff saw her family doctor with complaints of left-sided neck pain into her shoulder, and low back pain. The doctor noted that the neck pain could be a combination of the degenerative disk disease as well as fibromyalgia, but that

Meyerhoff seemed to have no interest in further followup with the fibromyalgia clinic or with rheumatology. The doctor noted that Meyerhoff was not interested in taking any of the medications they had suggested or that another doctor had offered and refused a possible referral to a pain clinic. (R. 481)

Meyerhoff returned to see the doctor on July 20, 2005, for followup, and she was referred for a neurosurgical consultation. (R. 480) Meyerhoff was seen for evaluation by a neurosurgeon on July 27, 2005, with regard to her complaints of neck pain, low back pain, and left leg pain. The doctor noted Meyerhoff's cervical spine x-rays revealed "extensive degenerative disk disease with some possible spinal stenosis." (R. 984) He ordered cervical and lumbar MRI studies and noted she also might need some shoulder x-rays. (*Id.*)

On July 29, 2005, Meyerhoff was seen in the Mercy Medical Center ER with complaints of sweating, nausea, and rapid heart rate. (R. 467-76) She was diagnosed with heart palpitation and an anxiety disorder/panic attack (*see* R. 471, 475), and the doctor prescribed Ativan, which Meyerhoff declined. (*Id.*) She was discharged home in stable condition. (R. 472) She followed up with her family doctor, and requested a thyroid check, which was done. (R. 478-79)

On August 1, 2005, Meyerhoff again was seen in the Mercy Medical Center ER (R. 456-66) for complaints of cold sweats, rapid heart rate, breathing problems, "pain in neck up to head and in her back," and a two-week history of low back pain. (R. 459) X-rays of her lumbosacral spine were compared with the November 2004 x-rays, and indicated "[m]ild multilevel degenerative disc disease and lower lumbar facet arthropathy." (R. 464) She was discharged the same day in stable and improved condition with prescriptions for Naprosyn and Lortab.

On August 9, 2005, x-rays and an MRI were taken of Meyerhoff's cervical and lumbar spine in connection with her ongoing complaints of back and neck pain. (R. 592-96) Her lumbar spine MRI was largely normal, showing some disc bulges and degenerative changes, but no significant spinal canal stenosis or neural foraminal narrowing. (R. 595-96) The cervical spine scans showed "degenerative endplate marrow changes at C5-6," with the following impressions: 1. C5-6 and C6-7 broad-based disc bulges with endplate spurformation. This results in canal stenosis and mass effect upon the spinal cord which is shifted posteriorly. The neural foramina at C5-6 are also stenotic. 2. Negative for current cervical cord edema or syrinx formation. 3. Reversal of the normal lordotic curvature. Cervical disc spaces also show diffuse disc desiccation and spondylosis. (R. 594) The neurosurgeon recommended Meyerhoff return for recheck in about a year "to make sure that she is not developing any significant myelopathy." (R. 980)

On September 20, 2005, Meyerhoff was seen for complaints of shortness of breath at night and a feeling of something stuck in her throat. Notes indicate Meyerhoff had been complaining to her doctors of shortness of breath for about six months. On this visit, she stated she sometimes became so short of breath that she feared she might pass out, although she was "vague whether this occurs with activity or at rest," and she was not short of breath at the examination. (R. 570) She also complained of "a stabbing-type chest pain on the right side of her chest," and "epigastric pain and weight loss." (*Id.*) The doctor noted Meyerhoff's records indicated she had undergone a thorough cardiac evaluation that was negative, and an upper GI series that was normal. Meyerhoff admitted to experiencing a great deal of stress related primarily to her financial situation and being homeless and indicated she might be willing to undergo some counseling. She did not have

reliable transportation to get to counseling, but was unwilling "to move forward with other avenues for getting to where counseling would be available." (R. 600)

Meyerhoff saw Nancy A. Knudtson, A.R.N.P., on October 3, 2005, for concerns regarding unintentional weight loss of twenty to thirty pounds since April 2005. Several lab tests were ordered, and Meyerhoff was encouraged to increase her caloric intake as much as possible. (R. 806-07) Meyerhoff was seen on October 10, 2005, for follow-up on her lab work. All of her lab results were normal. She was advised to quit smoking, and she was referred to an internal medicine specialist for evaluation regarding her weight loss and fatigue. (R. 802)

On October 18, 2005, Meyerhoff saw a nurse practitioner with complaints of the "loss of some of her eyebrows over the last few days," and also a concern about weight loss of about thirty pounds since April 2005. (R. 800) She was referred to a medical internist for consultation. Notes indicate Meyerhoff declined a prescription for antidepressants. (*Id.*)

On October 21, 2005, Meyerhoff saw Bruce Harlan, M.D., with a concern that she had lost thirty pounds over the past seven months. Meyerhoff "readily admit[ted] to significant depression," which she rated at 10 on a 10-point scale. Dr. Harlan indicated her weight loss was "probably psychiatric in origin," and he started her on Remeron at bedtime. He encouraged her to increase her daily caloric intake and to quit smoking. (R. 946-47)

On October 27, 2005, Stephen Holbrook, Psy.D., conducted a clinical interview, mental status evaluation, psychological testing, and review of Meyerhoff's treatment records, as a follow-up to his December 2004 evaluation. (R. 558-69) His diagnostic impressions included "Major Depressive Disorder, Recurrent, Moderate Severity; Rule

out Psychological Factors Underlying Medical Condition." (R. 568) He estimated her current GAF at 53.

On October 28, 2005, Mark D. Dankle, D.O., examined Meyerhoff at the request of the state agency. (R. 550-57) Meyerhoff reported current symptoms including chronic fatigue, weight loss due to stress, intermittent blurred vision, chronic tinnitus; neck, chest, and back pain; chronic cough related to smoking; some shortness of breath; occasional abdominal discomfort; lightheadedness if she stood too quickly; generalized weakness and shakiness; poor sleep; problems with anxiety and depression; and seborrhea on her face. (R. 551) After performing a physical examination, including testing Meyerhoff's ranges of motion and conducting a fibromyalgia evaluation, Dr. Dankle assessed Meyerhoff with "[c]hronic pain in her neck, back, left arm, and left leg"; "[h]istory of fibromyalgia"; and "[p]ossible valvular heart disease." (R. 552) He noted the following:

> In regards to her remaining physical capacity and limitations, I would recommend that she avoid heavy lifting and carrying. I believe that she is capable of lifting and carrying 20 pounds on occasion. I see no limitations with regards to standing, moving about, walking, or sitting. I see no limitations with regards to stooping, climbing, kneeling, or crawling. I see no limitations with regards to handling objects, seeing, hearing, speaking, traveling, or work environment. I see no limitations with regard to handling cash benefits.

(*Id.*)

On November 12, 2005, a consulting physician reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 523-30) The consultant opined Meyerhoff would be able to lift twenty pounds occasionally and ten pounds frequently; and sit, stand, and walk for about six hours each in an eight-hour workday, with no restrictions on her ability to push or pull. (R. 524) She should never perform

balancing activities, but could perform all other postural activities occasionally. (R. 525) On December 13, 2005, Dr. Jeffrey Wheeler reviewed the record and concurred in the findings of the November 12, 2005, evaluation. (R. 531-32)

On November 16, 2005, Beverly Westra, Ph.D., reviewed the record and completed a Psychiatric Review Technique form. (R. 533-46) She found Meyerhoff to have Major Depressive Disorder, moderate, but opined the impairment was not severe. She opined Meyerhoff would have mild difficulties in maintaining concentration, persistence, or pace, but otherwise would not be limited by mental impairments. (R. 543; *see* consultant's review comments at R. 545) On December 14, 2005, Philip Rosenshield reviewed the record and concurred in Dr. Westra's findings. (R. 547-48)

On January 9, 2006, Meyerhoff saw Nurse Knudtson for complaints of left upper arm pain, worsening over the previous couple of years. She was not taking any pain medications, stating Tylenol and Ibuprofen made her sleepy. She also was not using any heat or ice for discomfort. Nurse Knudtson consulted with a physician, and then recommended physical therapy for a month. She also recommended Meyerhoff take Ibuprofen 200 mg three times daily. Meyerhoff was seen again by Nurse Knudtson for complaints of left upper arm and shoulder pain on February 24, 2006. She was referred to a physician's assistant for consultation, and was directed to take Aleve for pain. (R. 788-90)

On February 28, 2006, Meyerhoff was seen by a physician's assistant "with chief complaint of left shoulder discomfort," which had bothered her for about two years. (R. 787) She was directed to try 800 mg of Ibuprofen three times daily for two weeks, with a plan to pursue a Depo-Medrol injection if the Ibuprofen failed to relieve her symptoms. (R. 785-87)

On March 21, 2006, Meyerhoff saw a doctor "for followup of her neck and low back pain." (R. 975) Meyerhoff complained of "diffuse aching in her neck, back, arms and legs." (*Id.*) On examination, she exhibited good strength, gait, and station; brisk reflexes at the arms and ankles; and no remarkable findings. She was directed to follow up as needed, and the doctor suggested she could see a doctor at the Rehabilitation Clinic for further treatment of her fibromyalgia, if desired. (*Id.*)

On May 11, 2006, Meyerhoff saw Nurse Knudtson for follow-up of her shoulder pain and "Fibromyalgia/Fibromyositis." (R. 781) Meyerhoff requested a referral for a second opinion regarding treatment for her shoulder pain. She was reluctant to take Ibuprofen or to receive Depo-Medrol injections proposed by doctors. She was referred to Leonard Shelhamer, M.D., for a consultation. (R. 780-81)

Meyerhoff saw Dr. Shelhamer on May 19, 2006, for follow-up of her fibromyalgia, and complaints of sleep disturbance, chronic fatigue, and depression. Dr. Shelhamer advised her that in his experience, "fibromyalgia patient's [sic] never get better unless they quit smoking," and she was advised to quit smoking. (R. 777) He recommended a regular exercise program, a combination of medications, and counseling to help her deal with the emotional aspects of her illness. He then noted, "Unfortunately, the patient is reluctant to pursue any of the above options. This is not only a pattern that she has exhibited in the past but it is quite common with fibromyalgia patient's [sic]." (R. 777-76)

On July 25, 2006, Meyerhoff was seen for complaints of joint pain, shoulder pain, and limb pain. A follow-up appointment occurred after an MRI, which showed "significant rotator cuff inflammation." (R. 771) Dr. Michael Eckstrom noted that Meyerhoff had "a large partial tear, if not a full thickness tear" of the rotator cuff." (*Id.*) Meyerhoff finally agreed to try an injection, and she returned on August 15, 2006, for the

injection. (R. 773) She also was referred for physical therapy. (R. 775) She was directed to return for follow-up in six weeks. (*Id.*)

Meyerhoff was seen by a physical therapist on August 18, 2006. She reported that the injection she had received on August 15th "was of very minimal help." (R. 821) Examination revealed "findings . . . consistent with the diagnosis of the chronic shoulder pain." (R. 822) The therapist noted Meyerhoff had "definite postural weakness causing increased impingement of the shoulders with movement." (*Id.*) She opined that Meyerhoff's rehabilitation potential was good, but she noted Meyerhoff would have to be consistent with her home exercise program in order to achieve her full potential. (*Id.*)

On November 27, 2006, Meyerhoff was seen at the Mason City Clinic Heart Center for evaluation of her complaints of chest pain. (R. 824-25) The doctor's impressions included "Atypical chest pain, most likely related to fibromyalgia"; "Mild mitral and tricuspid insufficiency"; and "Fibromyalgia." (R. 825) Meyerhoff was scheduled for a stress echocardiogram. (*Id.*) The echocardiogram apparently "showed possible anterior apical ischemia" (R. 834), and Meyerhoff was scheduled for an angiogram.

On December 18, 2006, Meyerhoff was evaluated by Mark D. Dankle, D.O., at the request of the state agency. (R. 828-33) Dr. Dankle determined that Meyerhoff would be able to lift ten to twenty pounds occasionally, but she should "avoid heavy lifting and carrying." (R. 830) He recommended that she stand, move about, walk, and sit at her tolerance and likely will need to change positions on a regular basis." (*Id.*) He recommended she "avoid stooping, climbing, kneeling, [and] crawling," but she could handle objects, see, hear, speak, and travel without limitations, and she would have no work-related environmental limitations. (*Id.*) Dr. Dankle found no fibromyalgia positive tender points. (R. 833)

On December 27, 2006, Meyerhoff underwent an angiogram. She "was found to not have any significant disease. Her chest pain was not felt to be cardiac in nature." (R. 834)

On January 19, 2007, Meyerhoff was seen by Carroll D. Roland, Ph.D., for a psychological evaluation at the request of the state agency. (R. 839-43) Dr. Roland noted "multiple indications of severe major depression," and suggested that Meyerhoff be evaluated by a mental health professional. (R. 842)

On February 10, 2007, Dee Wright, Ph.D., reviewed the record and completed a Psychiatric Review Technique form (R. 846-59), and a Mental Residual Functional Capacity Assessment form (R. 860-63). Dr. Wright concluded that, although Meyerhoff has diagnosed medically-determinable mental impairments that create some limitations of function for her, none of her limitations meets or equals the Listing level of severity. (*Id.*)

On February 12, 2007, Rene Staudacher, D.O., reviewed the record and completed a Physical Residual Functional Capacity Assessment form (R. 864-71). Dr. Staudacher opined Meyerhoff would be able to lift up to twenty pounds occasionally and ten pounds frequently; stand, walk, and sit for about six hours in an eight-hour workday with normal breaks; and perform all postural activities occasionally. The doctor noted Meyerhoff was reluctant to undergo medical treatment for her fibromyalgia, and she had only four fibromyalgia tender points, which did not "meet the criteria for the American College of Rheumatology classification for fibromyalgia." (R 866) The doctor found Meyerhoff's claims that she can only walk half a block, stand ten minutes, lift ten pounds, and sit for ten to fifteen minutes, to be inconsistent with objective exam findings and her activities of daily living. (*Id.*)

On April 10, 2007, neurosurgeon Darren S. Lovick, M.D., saw Meyerhoff for consultation with regard to "bulging disks and stenosis." (R. 882, 974) The doctor

explained to Meyerhoff that her "broad-based bulging disks and findings [were] normal as one gets older and certainly nothing surgical. There are no neurosurgical issues in her care." (*Id.*) He indicated there was nothing surgically that could be done to help Meyerhoff's pain, and her only restrictions would be "guided by pain and tolerance." (R. 881) He suggested she see a pain doctor for her pain. (*Id.*)

On May 10, 2007, James D. Wilson, M.D., reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 903-10) His opinions were identical to Staudacher's assessment from February 2007. (*See* R. 864-71) Dr. Wilson found that Meyerhoff's latest back exam, which was within normal limits, partially eroded the credibility of Meyerhoff's claim that she is limited by back pain. (R. 908)

On June 8, 2007, Jane Bibber, Ph.D., reviewed the record and completed a Mental Residual Functional Capacity Assessment form (R. 911-14). She affirmed Dr. Wright's February 10, 2007, assessment, noting Meyerhoff had no mental limitations in her activities of daily living. (R. 913)

On July 13, 2007, Meyerhoff saw Nurse Knudtson with complaints about neck and back pain, radiating into her lower back somewhat. She also complained of having "quite a bit of anxiety and feeling down in the dumps[.]" (R. 935) She was started on Lexapro for the depression, and was encouraged to go to the fibromyalgia clinic. She also was told to use ice or heat, and take Ibuprofen as needed. (R. 935-36)

Meyerhoff was seen for follow-up of her depression on August 3, 2007. She reported that Lexapro was helping her mood swings. She also reported that physical therapy was helping her neck pain and fibromyalgia symptoms. She was continued on Lexapro without change, and directed to continue physical therapy. Notes indicate the nurse practitioner encouraged Meyerhoff to consider counseling but Meyerhoff declined. (R. 932)

On September 11, 2007, Meyerhoff saw a nurse practitioner with complaints of neck pain, radiating down into her right flank area and causing headaches. She stated the pain had begun about two weeks earlier, and Tylenol was not helping the pain. She was given a prescription for Flexeril, and directed to continue taking Tylenol or Ibuprofen as needed. (R. 930)

On October 4, 2007, Meyerhoff saw Dr. Trimble for consultation with regard to her complaints of musculoskeletal discomfort and constant pain throughout her body. She reportedly was doing conditioning exercises at home, and she was taking Ibuprofen and Tylenol as needed. Dr. Trimble diagnosed her with fibromyalgia, depression, and "some tendinitis along the iliac crest." (R. 943) Dr. Trimble noted the following:

> Long discussion about fibromyalgia. Emphasized the importance of rest, adequate treatment of depression, and a regular exercise program. Emphasized that she has no evidence of true rheumatologic disease. I asked her to get back on her Wellbutrin on a regular basis. Take Tylenol on a regular basis. I did give her a prescription for Gabapentin 300 mg, one to two nightly for what may be restless legs. I will have physical therapy do ultrasound over Hydrocortisone paste to the iliac crest.

(*Id.*) Dr. Trimble also ordered several lab studies, and directed Meyerhoff to return for follow-up in one month. (*Id.*)

Meyerhoff returned for follow-up on November 16, 2007. Dr. Trimble's notes indicate that he had seen Meyerhoff on and off for her diagnosis of fibromyalgia "for ten years or so." (R. 984) She was sleeping somewhat better with Gabapentin for restless leg syndrome, but she was still stiff and tired in the mornings. Her depression was stable. Meyerhoff reported that she was "in a retraining workshop, and hope[d] to do at home medical transcription." (*Id.*) Dr. Trimble noted the following conclusions:

> Again had a long discussion with her about the nature of
> fibromyalgia, lack of a definitive treatment, the importance of
> controlled depression, adequate sleep, and a regular physical
> activity program. Told her that people do not generally do any
> better if they are not working. She does seem motivated to
> work but she will have some permanent restrictions. She
> should not work more than 8 hours a day, 40 hours a week.
> She should be allowed periodic breaks, should not do repetitive
> lifting or squatting, should not lift more than 20 pounds, and
> should not do repetitive work with the hands, other perhaps
> than typing/computer work.

(R. 964-65) He increased Meyerhoff's Gabapentin dosage, and suggested a trial of Lyrica.
(R. 965)

Meyerhoff saw Nurse Knudtson on December 5, 2007, with complaints of right hip
and low back pain since the morning of December 1, 2007. She stated the discomfort was
worse when she sat or walked, and better when she was lying down. She asked for "a note
to excuse her from a class that she was supposed to attend yesterday." (R. 1018) She had
somewhat limited range of motion of her right hip due to discomfort, and was tender to
palpation in the right hip area. Nurse Knudtson prescribed Lortab, and ice or heat for
fifteen minutes every couple of hours. (R. 1018-20)

On March 10, 2008, a doctor wrote a work release for Meyerhoff to return to work
with no restrictions. (R. 1017)

On July 14, 2008, Meyerhoff saw Nurse Knudtson with complaints of low back pain
and left knee pain. Notes indicate Meyerhoff had had "a flare up" a week earlier, "and
actually had to miss work a couple of days." (R. 1010) Meyerhoff was requesting a note
to excuse her for those two days off work. (*Id.*) Nurse Knudtson recommended
Meyerhoff increase her Tylenol dosage and use either ice or heat, whichever felt better,

to relieve her discomfort.  X-rays were ordered.  (R. 1011)  Nurse Knudtson also wrote Meyerhoff a work release for July 7 and 8, 2008.  (R. 1013)

On August 13, 2008, Nurse Knudtson wrote a letter to Meyerhoff indicating x-rays of Meyerhoff's lumbar spine showed "some degenerative joint disease." (R. 1009)  Nurse Knudtson recommended a course of physical therapy.  (*Id.*)

Meyerhoff next saw Dr. Trimble on August 27, 2008.  She reportedly was babysitting some grandchildren in the evening.  She was doing her own housework, but avoiding "the heaviest yard and garden work." (R. 962)  She was taking one or two Tylenol daily for pain.  She had stopped taking Gabapentin on her own, and also was not taking any antidepressant medications.  She was sleeping poorly at night, having discomfort in her shoulder, and walking sporadically for exercise.  She also was using a Theraband for some exercises, and her back pain and tendintis around the iliac crest had improved.  On examination, she had full ranges of motion, although she experienced discomfort on extremes of motion and exhibited tenderness in her neck and shoulders, and around both elbows and knees.  Dr. Trimble recommended Meyerhoff receive "more expert attention to the depression," and he suggested she contact the mental health clinic for evaluation.  He prescribed Tramadol and Tylenol for her fibromyalgia, and again emphasized the importance of mild regular exercise such as walking.  (R. 963)  He noted that there were "no other interim change[s] in health status nor social situation." (R.963)

Meyerhoff saw a counselor for evaluation on September 4, 2008.  (R. 966-69)  Meyerhoff described her history of depression and anxiety.  She stated she did not feel she was capable of working at the present time.  She was diagnosed with "depression due to fibromyalgia," and her current GAF was estimated at 50.  (R. 968)  Meyerhoff "seemed a little bit miffed by the referral from Dr. Trimble to psychiatry," and stated her symptoms

were not "significant enough to warrant any further therapy intervention or medication intervention so she [turned] down referral to staff psychiatry." (R. 968-69)

On September 24, 2008, Meyerhoff was seen by David W. Beck, M.D., for a neurosurgical consultation on referral from Dr. Trimble. Dr. Beck found Meyerhoff to be "intact" neurologically. He explained there was no surgical intervention that could help her, although he noted "[s]he may require surgery in the future because of spinal stenosis." (R 973) He started her on Lyrica and "sent her to therapy." (R. 972) He noted Meyerhoff would have "no formal restrictions of her lifting, carrying, standing, stooping, walking, kneeling[,]" and her restrictions would be "guided by pain and tolerance." (R. 973)

On October 30, 2008, Meyerhoff saw Nurse Knudtson with a complaint of "bilateral upper inner thigh pain off and on for a couple of years which seems to be getting worse." (R. 107) She was told to take Extra-Strength Tylenol as needed for pain; to exercise thirty to sixty minutes a day; and to continue doing her back range-of-motion exercises. (*Id.*)

On January 15, 2009, Meyerhoff was seen for a health maintenance exam. Notes indicate, among other things, that Meyerhoff felt well, had a good energy level, and tolerated exercise well. (R. 1000) After a complete examination, the doctors' assessment was fibromyalgia and nicotine dependence. Meyerhoff was encouraged to stop smoking. (R. 1002)

On January 23, 2009, Meyerhoff saw Dr. Trimble with a complaint of tingling in her hands, particularly the left. He diagnosed her with "relatively mild carpal tunnel symptoms on the left," and prescribed a splint to be worn nightly for four to six weeks and then periodically as needed. (R. 993)

On April 7, 2009, Dr. Eshelman-Peters completed a Treating Medical Source Statement (R. 1029-34)  She indicated Meyerhoff had been a patient at the clinic since 2005, and her primary diagnosis was chronic musculoskeletal pain.  The doctor characterized Meyerhoff's prognosis as "fair," and indicated she has chronic pain, predominantly in her back, worse with sustained position of over fifteen minutes at a time, and compromising her daily life.  She indicated Meyerhoff's ranges of motion are "impaired," but she does not have significant limitation of motion.  She indicated Meyerhoff has headaches an average of three times per week that are accompanied by photosensitivity, exhaustion, inability to concentrate, visual disturbances, and impaired appetite.  The doctor further indicated that although emotional factors contribute to the severity of Meyerhoff's symptoms and functional limitations, Meyerhoff has "no known" psychological conditions that affect her physical condition.  (R. 1030-31)  The doctor further stated that Meyerhoff's pain and other symptoms would interfere with her attention and concentration on a constant basis.  She stated that Meyerhoff would be able to sit for no more than fifteen minutes at a time, stand for no more than ten to fifteen minutes at a time, sit and stand/walk for a total of less than two hours in a normal workday, and walk less than one block without rest or severe pain.  Meyerhoff would need to walk around every fifteen minutes during a workday for about ten minutes at a time, and she would require a job that allows shifting of positions at will from sitting, standing, or walking.  She would need unscheduled breaks to lie down every ten to fifteen minutes, lasting ten minutes at a time.  The doctor further opined Meyerhoff would be able to lift less than ten pounds occasionally and ten pounds rarely; she could twist, climb stairs, and hold her head in a static/neutral position occasionally; rarely stoop/bend and crouch/squat; and never look down (sustained flexion of her neck), turn her head right or left, look up, or climb ladders.  She further indicated Meyerhoff should avoid exposure to excessive heat or

humidity, odors, dust, and fumes. (R. 1032-33) She felt that Meyerhoff would be absent from work more than four days per month. (R. 1033)

### 3. Vocational expert's testimony

The VE testified that a review of Meyerhoff's work history shows she has worked in general housekeeping, some commercial cleaning, and as a flagger, all of which are unskilled jobs, but none of her work was at the substantial gainful activity level. (R. 58) The ALJ asked the VE the following hypothetical question:

> Could you please assume a hypothetical individual, . . . and this hypothetical, this first hypothetical individual is limited exertionally to the performance of no more than light work activity. This individual could lift and carry up to 10 pounds, up to 20 pounds occasionally, 10 pounds frequently; stand and walk up to 6 hours in an 8 hour work day; sit up to 6 hours in an 8 hour work day. This individual could occasionally climb, bend, balance, stoop, kneel, crouch, crawl. This individual could only occasionally handle bilaterally. This individual could, should only be occasionally exposed to extreme heat or humidity. This individual would be limited to tasks that could be learned in 30 days or less involving no more than simple work related decisions with few work place changes. This individual should have only occasional interaction with the public and coworkers and this individual should work in an environment free of fast paced production requirements. Now, this individual has the same vocational profile as [Meyerhoff]. So, I am not going to ask you whether she can perform her past work, because she has none. Are there light, unskilled jobs in the national economy that could be performed by an individual with these limitations?

(R. 59) The VE stated the hypothetical individual could perform work at the light, unskilled level. He gave examples of lot attendant, mail clerk or sorter in private industry (as opposed to a governmental position), and coin machine collector. (R. 59-60)

The ALJ next asked the VE to consider the same hypothetical individual, but "limited exertionally to no more than sedentary work, where this individual could lift and carry no more than 10 pounds at a time, less than 10 pounds frequently, up to 10 pounds occasionally; [and] standing and walking would be limited to 2 hours in an 8 hour work day[.]" (R. 60)  The VE indicated there were no sedentary, unskilled jobs the individual could perform that exist in any significant numbers in the national economy.  (*Id.*)

The ALJ next asked the VE to return to the first hypothetical individual who can perform work at the light level, but to add the limitation of the necessity to be absent from work three or more times each month.  The VE indicated such a person could not perform work on a competitive and sustained basis.  (R. 60-61)  Similarly, absenteeism of three times per week would eliminate competitive employment.  (R. 61-62)

Meyerhoff's attorney then asked the VE to consider the effect on all of the ALJ's three hypothetical individuals if the person "would have to change positions at least every 15 minutes, either standing or sitting and then maintaining the altered position for 10 to 15 minutes or more."  (R. 62)  The VE stated that such an individual would be unable to work, explaining that "unskilled work is specifically structured so that a worker does not have the option of changing positions, more or less, at will.  That's . . . just a general assumption and in fact it's noted in the . . . regulations[.]" (*Id.*)  The VE stated that changing positions "from standing to walking to sitting every 15 minutes or so would affect an individual's pace to where competitive employment can not be performed." (*Id.*) He further stated that if an individual could "lift less than 10 pounds and rarely lift 10 pounds," the individual would not be able to perform even sedentary work.  (*Id.*)

### 4.    The ALJ's Decision

The ALJ applied the five-step sequential evaluation process for determining whether an individual is disabled.  First, the ALJ determined that Meyerhoff had not engaged in

substantial gainful activity since August 17, 2006, the date of her application.  The ALJ found that Meyerhoff has severe impairments consisting of degenerative disk disease at C5-6 and L2-3, fibromyalgia, osteoporosis, depression, anxiety, carpal tunnel syndrome, rotator cuff tear on the left, and headaches.  However, the ALJ found that Meyerhoff does not have an impairment or combination of impairments that meets or medially equals one of the listed impairments.  (R. 13)

After carefully reviewing the entire record, the ALJ found that Meyerhoff has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) because Meyerhoff can lift and carry up to 20 pounds occasionally and up to ten pounds frequently; she can stand and walk a total of six hours out of an eight hour workday; she can sit six hours out of an eight hour workday; she can occasionally climb, bend, balance, stoop, kneel, crouch and crawl; she is limited in her ability to repetitively handle, and can only occasionally handle, bilaterally; she can tolerate only occasional exposure to extremes of heat and humidity; she requires tasks that can be learned in 30 days or less, involving no more than simple work related decisions with few work place changes; she can tolerate only occasional interaction with the public and co-workers; and, she requires an environment free of fast paced production requirements.  (R. 15)

The ALJ found Meyerhoff's subjective complaints regarding the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they differed from the residual functional capacity as found by the ALJ.  In so finding, the ALJ noted several inconsistencies between Meyerhoff's subjective complaints and the medical evidence of record, and she concluded "the objective findings in this case fail to provide strong support for the allegations of symptoms which produce limitations on the claimant's ability to perform basic work activities." (R. 17; *see* R. 16-17)

In giving considerable weight to Dr. Dankle's opinions, the ALJ noted that "Dr. Dankle indicated the claimant was capable of lifting 10 to 20 pounds on occasion. He stated that she could stand, move about, walk and sit at her tolerance with a change in positions. She should avoid stooping, climbing, kneeling and crawling. She had no limitations with handling objects, seeing, hearing, speaking, traveling or with regards to a work environment." (R. 18) The ALJ found Dr. Dankle's opinions to be consistent with the medical evidence of record. (*Id.*)

The ALJ gave minimal weight to the diagnosis of "major depressive disorder, single episode and panic disorder with agoraphobia," given by Carroll D. Roland, PhD., noting that Dr. Roland "only saw the claimant on one occasion[,] did not perform a records review and seemed to rely only on the subjective complaints of the claimant in rendering her opinion." (*Id.*) The ALJ gave minimal weight to Dr. Roland's opinion that Meyerhoff "was not capable of handling the stress of an entry level job until her depression and panic disorder were under control."

The ALJ noted that Dr. Lovick, upon examination of Meyerhoff, had indicated that Meyerhoff's restrictions would be "guided by pain and tolerance," but that Meyerhoff had no formal restrictions on her ability to lift, carry, stand, stoop, walk, kneel, handle, hear, see, speak, travel, and work environment. (*Id.*)

The ALJ further noted that Dr. Trimble, who treated Meyerhoff off and on from 2004 until 2008, indicated that Meyerhoff should not work more than eight hours a day, 40 hours a week, with periodic breaks, and should not lift more than twenty pounds; "should not perform repetitive work with her hands, other than typing or computer work"; and should not work more than eight hours a day, forty hours a week. (*Id.*) The ALJ gave considerable weight to Dr. Trimble's opinions. (*Id.*)

The ALJ gave "lesser weight" to the opinions of Dr. Eshelman-Peters, noting the doctor's "extreme recommendations are inconsistent with the entire medical record, including the opinion of the claimant's treating physician Dr. Trimble and the claimant's own self report at Exhibit B5E [a Function Report completed by Meyerhoff on September 8, 2006]." (R. 19; *see* Ex. B5E, R. 287-95)

The ALJ found Meyerhoff had no past relevant work, a limited education, and was "approaching advanced age" as of the date her application was filed. (R. 19) Considering Meyerhoff's age, education, work experience, and residual functional capacity, the ALJ concluded Meyerhoff is able to work at less than the full range of unskilled, light jobs, but she nevertheless has the capacity to perform jobs that exist in significant numbers in the national economy such as lot attendant, mail clerk, and coin machine collector. (R. 20) She therefore concluded that Meyerhoff is not disabled. (R. 21)

## II.  LEGAL STANDARDS

### A.  Review Of A Report And Recommendation

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and

recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails

review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general *pro se* objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

34

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[2]

---

[2] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain

(continued...)

Judge Zoss determined that there was overwhelming evidence that Meyerhoff was disabled, and remanded for a determination of when Meyerhoff's disability began, for purposes of calculation and immediate award of benefits and for consideration of whether to reopen Meyerhoff's prior applications. The Commissioner objects to Judge Zoss's finding that there is overwhelming evidence in the record to support a finding of disability and an immediate award of benefits. The Commissioner also objects to the matter being remanded to determine whether Meyerhoff's prior applicaitons should be re-opened. As a result, the court will review these finding *de novo* and Judge Zoss's remaining findings for clear error.

---

[2](...continued)

error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will *not* result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

## B.  Review Of The Commissioner's Decision

When a court reviews the Commissioner's decision, it does so to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998).  Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion.") (quoting *Haggard*, 175 F.3d at 594).  Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

While "substantial evidence" is enough to affirm the Commissioner's decision denying benefits, reversal and remand for an immediate award of benefits is the appropriate remedy only where the record overwhelmingly supports a finding of disability. *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009) (citing *Taylor v. Chater*, 118 F.3d 1274, 1279 (8th Cir. 1997), and *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984) ("Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.").  More specifically,

> Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of "our abundant deference to the ALJ," remand the case for further administrative proceedings. *Cox v. Apfel*, 160

38

> F.3d 1203, 1210 (8th Cir. 1998). Consistent with this rule, we may enter an immediate finding of disability only if the record "overwhelmingly supports" such a finding. *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir. 1992); *see Fowler v. Bowen*, 866 F.2d 249, 253 (8th Cir. 1989); *Talbott v. Bowen*, 821 F.2d 511, 514 (8th Cir. 1987).

*Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000).

Therefore, the court will consider whether there was substantial evidence in support of the ALJ's factual findings and, in light of Judge Zoss's recommendation that the ALJ's denial of benefits be reversed, consider whether there is, instead, overwhelming evidence supporting a finding of disability contrary to the ALJ's findings.

## III. LEGAL ANALYSIS

Although no objection was made to the pertinent portion of Judge Zoss's Report and Recommendation, the court notes, first, that Judge Zoss improperly applied the "substantial evidence" test to the evidence in the record purportedly supporting Meyerhoff's claim that she is disabled. *See* Report and Recommendation at 47. The question is not whether "substantial evidence" supports a disappointed claimant's claim of disability, but "whether the Commissioner's findings [denying benefits] are supported by substantial evidence in the record as a whole." *Page*, 484 F.3d at 1042. Misapplication of the "substantial evidence" standard is, at least, subject to review for "clear error," *see Grinder*, 73 F.3d at 795 (in the absence of any objection, a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review), and may be subject to *de novo* review, as an error of law, even in the absence of an objection. *See, e.g.*, *Maxwell*, 498 F.3d at 801 n.2 (the appellate court will review the district court's legal conclusions *de novo*, even if there was no objection to an error of law

in the magistrate judge's recommendation). Certainly, it is an error of law warranting at least modification of the Report and Recommendation. *See* 28 U.S.C. § 636(b)(1) (the reviewing court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge"). The court will return to a *de novo* application of the "substantial evidence" standard to the Commissioner's denial of benefits, a matter to which objection was made, below.

Before doing so, however, this court turns to the Commissioner's objection to Judge Zoss's recommendation that the denial of benefits be reversed. Upon *de novo* review, *see Thomas*, 474 U.S. at 154, the court finds that it cannot accept Judge Zoss's conclusion, *see* 28 U.S.C. § 636(b)(1), that the record "overwhelmingly supports" an immediate finding of disability and consequent reversal of the Commissioner's decision. *See Page-Fires*, 564 F.3d at 947; *Buckner*, 213 F.3d at 1011. Evidence supporting the disabling limitation found by Judge Zoss—Meyerhoff's purported need to change positions frequently, as often as every fifteen minutes—comes primarily from Meyerhoff's subjective testimony about her limitations, her treating physician's treatment notes, and a form that the treating physician completed, entitled "Medical Opinion Re: Ability to do Work-Related Activities (Mental)." R. at 427-428. "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008) (citing *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)); *see also* 20 C.F.R. § 404.1527(d)(2). If the Commissioner does not give a "treating source's opinion controlling weight," he will consider: 1) the "[l]ength of the treatment relationship and the frequency of examination;" 2) the "[n]ature and extent of the treatment relationship;" and 3) the "[s]upportability . . . [,] [s]pecialization . . . [,] and

other "factors [the claimant] or others bring to [the Commissioner's] attention." 20 C.F.R. § 404.1527(d)(2)-(6). Here, the ALJ reasonably discounted the credibility of the treating physician's opinion regarding such a limitation, in light of its equivocal support or lack of support in the evaluations of various other medical professionals. *See Hamilton*, 518 F.3d at 610 (a treating physician's opinion may be disregarded if, for example, it is inconsistent with other substantial evidence in the record). Moreover, a claimant's noncompliance with recommended treatment can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight. *See, e.g., Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008). Here, the record is replete with instances in which Meyerhoff declined to follow specific treatment recommendations or to pursue further evaluation, sometimes with an indication that Meyerhoff stated that her reason was that she wanted to be found disabled. However, the record also does not indicate any thorough exploration of reasons for Meyerhoff's noncompliance with treatment recommendations. *Id.* Thus, there is not "overwhelming" support for Meyerhoff's claim of disability.

On the other hand, the court cannot find that there is "substantial evidence" supporting the Commissioner's determination that Meyerhoff is not disabled. *See Page*, 484 F.3d at 1042. This is so, because health professionals other than Meyerhoff's primary treating physician recognized varying frequencies with which Meyerhoff would be required to take "periodic breaks" (Dr. Trimble), or to change position, from sitting to standing, for example, or merely "shift" positions, and what health professionals meant by her need to do so within her pain "tolerances" (Dr. Dankle). These inconsistencies make the record inadequate to support any conclusion that Meyerhoff can stand or sit for six hours out of an eight-hour day or any other period of time that would make her employable and beg for further clarification. However, these same inconsistencies also make the record inadequate

to support any conclusion that Meyerhoff cannot stand or sit for six hours out of an eight-hour day or would otherwise make her unemployable. The ALJ must re-contact medical sources if the evidence "is inadequate for [the ALJ] to determine whether [the claimant is] disabled." 20 C.F.R. § 404.1512(e). In that case, the ALJ must "first re-contact [the claimant's] treating physician. . . .to determine whether the additional information [the ALJ] needs is readily available." *Id.* The ALJ is required to "seek additional evidence or clarification from [the claimant's] medical source[s] when the report from [the] medical source[s] contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Id.* The court believes that circumstances here required further inquiry by the ALJ into Meyerhoff's need for periodic breaks or the opportunity to shift or change positions, particularly from Dr. Dankle and Dr. Trimble. *Id.*

Similarly, the court believes that the hypothetical questions posed to the vocational expert may have been inadequate. Testimony from a vocational expert is "substantial evidence" only when the testimony is based on a correctly-phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies. *Roberts v. Apfel*, 222 F.3d 466, 471 (8th Cir. 2000). Here, the hypothetical questions posed to the vocational expert may not have constituted substantial evidence that Meyerhoff is not disabled, in that they did not adequately account for any limitations on Meyerhoff's ability to sit or stand for sustained periods of time without breaks or the opportunity to shift or change positions within the limits of her pain tolerances. Meyerhoff's attorney did pose a hypothetical question including limitations on sitting and standing. However, the limitations included in the hypothetical asked by Meyerhoff's attorney were only the limitations provided by Meyerhoff's subjective opinions and the opinion of her treating physician, which may, for

reasons discussed above, not adequately reflect the concrete consequences of Meyerhoff's actual deficiencies regarding her ability to sit or stand.

In short, upon *de novo* review of Judge Zoss's determination to reverse the denial of benefits, this court concludes that this is *not* a case in which the record "overwhelmingly supports" an immediate award of benefits, but the more usual case in which, because of the court's conclusion that the denial of benefits was improper, on the present record, the court should, "out of 'our abundant deference to the ALJ,' remand the case for further administrative proceedings." *Buckner*, 213 F.3d at 1011 (quoting *Cox*, 160 F.3d at 1210).

Because a remand is the more appropriate disposition of this case, the court also considers only briefly the Commissioner's objection to Judge Zoss's conclusion that the case should be remanded to determine whether or not to reopen Meyerhoff's prior applications as part of the consideration of the period when Meyerhoff's disability commenced if, indeed, she is found to be disabled. Judge Zoss noted this court's conclusion that, where no final decision has been made on the reopening issue, the issue is not subject to appeal, *see* Report and Recommendation at 48 (citing *Slycord v. Chater*, 921 F. Supp. 631, 638-40 (N.D. Iowa 1996)), then took the inconsistent position of recommending a remand on an issue that was not properly before the court on appeal. *See* Report and Recommendation 48-49. As the Eighth Circuit Court of Appeals has explained,

> Under [42 U.S.C.] § 405(g), courts generally lack jurisdiction to review the Commissioner's refusal to reopen the proceeding because a refusal to reopen the proceeding is not a "final decision of the Commissioner . . . made after a hearing." 42 U.S.C. § 405(g); *see Califano v. Sanders*, 430 U.S. 99, 107-08, 97 S. Ct. 980, 51 L. Ed.2d 192 (1977); *Boock v. Shalala*, 48 F.3d 348, 351 (8th Cir. 1995). Jurisdiction may

> exist, however, if the claimant challenges the refusal to reopen
> the proceeding on constitutional grounds. *Califano*, 430 U.S.
> at 109, 97 S. Ct. 980; *Boock*, 48 F.3d at 351.

*Efinchuk v. Astrue*, 480 F.3d 846, 848 (8th Cir. 2007). This court does not have jurisdiction to consider the Commissioner's failure to reopen the prior applications and, consequently, takes no position on whether or not the Commissioner should reopen the proceedings on remand.

## IV.  CONCLUSION

Upon *de novo* review of the portions of Judge Zoss's August 9, 2010, Report and Recommendation (docket no. 16) to which the Commissioner has objected, this court **rejects** the recommendation to reverse the decision of the Commissioner denying Meyerhoff's claim for disability benefits and to remand this case for a determination of when Meyerhoff's disability began, including a determination of whether to reopen her prior applications, for purposes of calculation and immediate award of benefits. Instead, out of an abundance of deference for the Commissioner's decision, this court **remands** this action for further administrative proceedings on Meyerhoff's application for disability benefits.

**IT IS SO ORDERED.**

**DATED** this 31st day of March, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA